IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF PHOENIX W. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF PHOENIX W. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.


STATE OF NEBRASKA, APPELLEE,

V.

BRADLEY W., APPELLANT.


Filed April 2, 2019.    No. A-18-687.


Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.

Donald W. Kleine, Douglas County Attorney, and Anthony M. Hernandez for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

Bradley W. (Bradley) appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his children, Phoenix W., Bradley W. II (Bradley II), and Akira W. We affirm.

## FACTUAL BACKGROUND

### PROCEDURAL BACKGROUND

Bradley is the biological father of twins Phoenix and Bradley II (born 2010) and Akira (born 2012). The State also filed a motion to terminate the parental rights of the children's mother during these proceedings, and the mother voluntarily relinquished her parental rights to the

children during the course of the termination of parental rights hearing. Because the children's mother is not part of this appeal, she will only be discussed as necessary.

This case was previously before us on an appeal of the juvenile court's order adjudicating the children to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015), by reason of the faults or habits of Bradley. In our memorandum opinion in case No. A-16-759, filed on April 20, 2017, we set forth the following factual background as to how the case came into being:

At the time the proceedings were initiated in December 2015, the children's mother was minimally involved in their lives. The children were living with Bradley's grandmother, Betty W., during the week and with other relatives during some weekends. Bradley cared for the children approximately every other weekend.

On December 14, 2015, the Department of Health and Human Services . . . received a report that Phoenix had been sexually assaulted by Bradley. As a result of this report, the Department conducted an investigation. As a part of this investigation, each of the children participated in a forensic interview.

During Phoenix's forensic interview, she stated, "only dad touches on my privacy." Phoenix indicated to the interviewer that "her privacy" is her vagina. Phoenix indicated that the touching occurs over her clothes and she demonstrated to the interviewer how Bradley touched her. Phoenix also stated that she told her great-grandmother, who she refers to as Nana, about Bradley touching her privacy and that "Nana whooped him," but Bradley continued to touch her. Phoenix told the interviewer that sometimes she and Bradley go to bed together and that she is not okay with that. She then stated, "It's nothing, I want to go back." During the interview, Phoenix also reported that her Nana gives her "whoopings" with a belt or a switch on her "butt."

On December 15, 2015, the State filed a petition alleging that Phoenix, Bradley II, and Akira were children within the meaning of § 43-247(3)(a), by reason of the faults or habits of Bradley in that: Bradley subjected Phoenix to sexual contact; Bradley subjected the children to inappropriate physical discipline; Bradley left the children with an inappropriate caregiver; Bradley's use of alcohol and/or controlled substances placed the children at risk for harm; Bradley failed to provide proper parental care, support, and/or supervision for the children; and due to the above allegations, the children were at risk of harm. That same day, the State filed an ex parte motion for immediate custody, which was granted by the juvenile court. The juvenile court granted the Nebraska Department of Health and Human Services (DHHS) temporary custody of the children for placement in foster care or other appropriate placement, to exclude the home of Bradley. The children were removed from Betty's home and from Bradley's custody and placed in a foster home.

In on order filed on January 5, 2016, the juvenile court ordered that Bradley should have no visitation until further order of the court; no further order granting visitation was ever entered.

After a contested adjudication hearing in May and June 2016, the juvenile court filed its order in July adjudicating the children to be within the meaning of § 43-247(3)(a). Bradley appealed the adjudication. In our memorandum opinion noted above, this court affirmed the adjudication. In that opinion, we stated, "[T]he evidence presented at the adjudication hearing revealed that on at least four occasions Phoenix stated that Bradley has touched her 'privacy.' She

indicated that the touching occurred over her clothes." "At least two mental health professionals indicated that Phoenix's behavior at the time of her disclosures, including avoidance, was consistent with a child who had been sexually abused." This court acknowledged that the evidence presented at the hearing "was not overwhelming," but based on our de novo review of the record, we concluded that the State proved by a preponderance of the evidence that Bradley submitted Phoenix to sexual contact, had left his children with an inappropriate caregiver (Betty had inappropriately physically disciplined Phoenix), and failed to provide proper parental care, support, and supervision for the children (during the more than 5 years Betty had been providing care for Bradley's children, he had not been providing significant financial support, nor had he been closely involved in their lives). Accordingly, we affirmed the adjudication. Bradley's petition for further review was denied by the Nebraska Supreme Court on July 6, 2017. This court's mandate was issued on July 24, and was filed in the juvenile court on July 26. Also on July 26, the juvenile court, after reviewing the mandate, set the disposition and permanency planning hearing for August 17.

Following the disposition and permanency planning hearing on August 17, 2017, the juvenile court filed its order on August 18. The court ordered Bradley to complete (1) a "psycho-sexual" evaluation, and (2) a chemical dependency evaluation and follow the recommendations. Also on August 18, the State filed a motion to terminate Bradley's parental rights to the children pursuant to Neb. Rev. Stat. § 43-292(1), (2), (7), and (9) (Reissue 2016). The State alleged that: Bradley abandoned the children for 6 months or more immediately prior to the filing of the petition; Bradley substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; the children had been in an out-of-home placement for 15 or more of the most recent 22 months; Bradley had subjected the children or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination was in the children's best interests.

TERMINATION HEARING

The hearing on the motion for termination of Bradley's parental rights to the children was held over 3 days in March, April, and May 2018. A summary of the relevant evidence follows.

Sarah Kwiatkowski is a family permanency supervisor at PromiseShip, formerly known as Nebraska Families Collaborative (NFC). Prior to July 1, 2017, she was a family permanency specialist (FPS). Kwiatkowski was assigned to this case in February 2016 and was the FPS until July 2017. Kwiatkowski testified that the children came into care because there were disclosures regarding sexual abuse by their father. There were never any dispositional orders entered during Kwiatkowski's time on the case because there was an appeal of the adjudication.

Kwiatkowski met or attempted to meet with Bradley once a month. Exhibit 52 summarized her contacts or attempts to contact him (she testified that any dates in the exhibit with the year 2018 should really be 2016 or 2017). That exhibit reflects that from February to May 2016, Bradley either met with Kwiatkowski and refused services, or refused to speak with her. In June, Bradley asked what he needed to do to get his children back and she suggested that he participate in a psychosexual evaluation. In July, Bradley said he did not have any questions about the children or court. In August, Bradley demanded to know why the children were not placed with any of his

family. In September, Kwiatkowski spoke with Bradley on the phone about the children, but he refused to meet in person. In October, Kwiatkowski saw Bradley at the foster care review board meeting, but he refused to meet with her outside of that meeting. In November, Kwiatkowski attempted to contact Bradley via phone but his phone number was disconnected. In December, Kwiatkowski saw Bradley at the family team meeting, but he would not engage. In January 2017, she attempted to meet Bradley at a scheduled court hearing but he did not attend and attempts to contact him via his attorney did not get a response. From February to May, Kwiatkowski made attempts to contact Bradley by various means, including searching inmate databases and Facebook.

In addition to exhibit 52, Kwiatkowski also testified about her contacts with Bradley. She spoke with Bradley about "housing and resources and job searching" and offered family support to help with those resources; he declined. On June 30, 2016, Bradley asked what he needed to do to get his children back and Kwiatkowski said that the first step would be a psychosexual evaluation; in her testimony she affirmed that she told Bradley that if he could not afford it, NFC would help with the cost of the evaluation.

Kwiatkowski was asked about the process to have PromiseShip pay for an evaluation. She said that the parent is asked to complete a budget to determine if they are able to contribute to the cost of their evaluation. After the budget is completed, a referral is submitted. Kwiatkowski never completed a budget with Bradley, but did have a conversation with him about the need for a budget; the conversation occurred after the ruling was made on the adjudication. She stated that, after that conversation, "I did not meet with [Bradley] in person again, as he would not commit to times with me. I believe he stated to me 'If there was nothing more to talk about, he would -- in-person, as his case was on appeal, then he would just prefer that we did not meet.'" Kwiatkowski received an email from Bradley's lawyer in July 2017 asking that a psychosexual evaluation be set up for Bradley, which Kwiatkowski forwarded to the current FPS.

Bradley was court ordered not to have visitation with his children, but when asked if there were services that Bradley could have participated in that may have reduced the restrictiveness of that court order, Kwiatkowski responded, "I believe, if he would have participated in the [psychosexual] evaluation or in any sort of evaluation or parenting class or things like that, we could have better understood his parenting skills and what would have been appropriate." Kwiatkowski stated she had covered services NFC provided, like family support, but Bradley declined. During Kwiatkowski's time on the case, Bradley expressed desire to parent his children, but he did not demonstrate any behaviors to support that expressed desire.

Tara Bell is an FPS with PromiseShip. She was assigned to this case in July 2017, taking over for Kwiatkowski. When Bell was assigned the case, the adjudication was still on appeal, so no dispositional orders had been entered. Exhibit 58 documents Bell's attempts to contact Bradley. According to that exhibit, Bradley called Bell in July stating that he wanted to start visits with his children and wanted to know what he needed to do to accomplish that; Bell suggested a family team meeting to go over next steps. Their first team meeting was in October because Bradley had been incarcerated since the end of July. Bell did meet with Bradley while he was incarcerated. In August they discussed services that Bradley could participate in, namely a chemical dependency evaluation and a psychosexual evaluation. According to exhibit 58, Bell's attempts to meet with Bradley in November and December were unsuccessful; in January 2018 Bradley told Bell that he did not want to meet with her and that she needed to contact his lawyer with concerns or questions.

Bell testified that Bradley has not provided any monetary support, clothing, cards, or letters to his children. Bradley told Bell he completed a parenting course, but he never provided proof of completion to Bell. Bradley did complete the chemical dependency and psychosexual evaluations, but Bell had not been able to make recommendations based off of the evaluations yet because she had not received a copy of the chemical dependency evaluation (the agency did not pay for the evaluation, so Bradley has to sign a release) and she only recently received the psychosexual evaluation.

It is Bell's opinion that Bradley "cannot provide safety and well-being for the children and also attend to their emotional well-being." Bradley "has not shown any efforts to ask about the kids' emotional well-being, and he's had no contact with them since -- for two years." When asked if Bradley had taken independent steps to alleviate the concerns that brought the case into care, Bell responded, "No." And the fact that it took over a year for the psychosexual evaluation to be completed had an impact on Bell's opinion, as did the fact that he did not complete any services until "just a few months ago." The children deserve permanency and Bradley had not done anything to move the children towards permanency with him.

Linda Degner is a provisionally licensed mental health practitioner and is a children's therapist with Lutheran Family Services' RSafe program, "a program designed to help families . . . who are impacted by sexual abuse." Degner has been treating Phoenix, Bradley II, and Akira since March 20, 2017, and sees them weekly (although Akira was discharged from July to October 2017 because there was limited progress and limited support from the caregiver at that time). It was Degner's understanding that the children were coming to her for therapy because there was a report that Phoenix disclosed sexual abuse by her father. (During her testimony, Kwiatkowski stated that Bradley II made some disclosure about observing his father having sex with females, and Bradley II was caught trying to undress Akira and was also undressing himself and "trying to crawl on top of her," and that was one of the reasons there was a referral to RSafe.) When asked if it was her understanding that the children were being transferred to her due to lack of therapeutic progress with the previous therapist, Degner responded, "Yes."

Degner testified that when the children first became her clients (in March 2017), Betty was their caregiver. (We note that from January to October 2017, the children had been temporarily placed with Betty.) All three children were diagnosed with an adjustment disorder. Phoenix presented with fear, anxiety, and sadness. Bradley II and Akira presented with anger, fear, and anxiety. According to their May 2017 treatment plans, which were received into evidence, Phoenix had anxiety and confusion about changes, struggled with adoption and divided loyalty, feelings of anger and wanting to hurt others; Bradley II had difficulty expressing feelings, confusion about exposure to sexual behaviors, and confusion about messages received; and Akira had difficulty expressing feelings, possible exposure to sexual behaviors, confusion about physical boundaries and appropriate touch. The treatment goals for the children were to address trauma-related symptoms and to teach boundaries and privacy rules.

Degner compiled lists of concerning statements that the children made during therapy. Exhibits 43 through 45 are the lists she compiled for Phoenix, Bradley II, and Akira, respectively. The exhibits were received over Bradley's hearsay and foundation objections. Exhibit 43 reflects that Phoenix made the following statements during therapy:

1. April 3, 2017 - . . . [Phoenix] was asked about why she is coming to therapy and she stated "because we are in foster care, because sometimes we are mad or sad, and because daddy touched my privates."

2. May 15, 2017 - When asked to identify feelings and situations that cause feelings, Phoenix stated "it's none of your business." When asked why she said that she explained she was told that she is not allowed to tell her business. When asked who told her that, she stated "Nana told me."

. . . .

4. November 13, 2017 - . . . . [Phoenix] said "Nana whooped us when we didn't listen." She stated "Nana whooped us with a switch." . . .

5. February 12, 2018 - Phoenix said her dad (Bradley) "choked me." She stated that she was scared. She said her dad choked her and Bradley but Akira was little so he did not do that to her. . . . Phoenix said her dad "broke a privacy rule" when "dad touched my privates." She also said she used to feel scared when she came to therapy because "I was afraid I would get whooped by Nana if I said anything." . . .

. . . .

9. March 19, 2018 - It was reported by [foster mother] that Phoenix has been caught putting objects in her vagina. It was reported that Phoenix said her father did that to her with a remote.

Exhibit 44 reflects that Bradley II made the following statements during therapy (although the statements in the quote below are attributed to "Bradley," it is clear the statements were made by Bradley II):

1. April 3, 2017 - . . . . Most questions he answered "I don't want to talk about it," or "I can't tell you my business."

2. May 1, 2017 - When Bradley was asked to work on a therapeutic activity he stated "I'm not [sic] tell you my business." When asked why he did not want to talk to me he stated "Nana said not to." When asked why he stated "Nana will whoop us." . . .

3. May 8, 2017 - . . . . [Bradley II said] "I told you last Monday that I can't tell you my business." When asked who told him he cannot tell he stated "Nana." He was then asked when he is told that and he stated "every time before we come here."

. . . .

8. October 23, 2017 - . . . . [W]hen asked what happened at Nana's if he did not listen, Bradley stated "Nana would whoop us." When asked what "whoop" means, he stated "we would get spanked with a stick."

. . . .

12. January 29, 2018 - Bradley stated he was "whooped and choked" by his father, Bradley. Bradley stated he was at his aunt's house in the bedroom and his father came in, grabbed him by the neck, and lifted him against the wall. He said "I was choking and scared I was going to die." He said his father dropped him and he hurt his head. . . .

. . . .

14. February 12, 2018 - Bradley talked about people who had physically hurt him and he stated it was "everyone in the family except my mom." When reviewing privacy rules Bradley stated he has seen private parts on videos that his dad . . . watched.

15. March 5, 2018 - It was reported that Bradley told someone at school "I'm going to kill you." When asked about it he said he was kidding and did not mean it. When asked how someone might feel if someone heard that he said "my dad said it to me when he choked me."

Exhibit 45 reflects that Akira made the following statements during therapy:

. . . .

6. November 14, 2017 - Akira was asked how she was doing and she responded with "I don't want to talk about it." When asked other neutral questions Akira continued to respond with "I don't want to talk about it." . . . She said she used to get in trouble for "telling things" and that "Nana whooped me with a switch." Akira stated Betty W[.] (Nana) "whooped me on my butt and my hands with a switch."

7. January 23, 2018 - . . . . Akira also stated "my dad whooped me with a belt."

Degner relied on the children's statements in addressing their fear and anxiety symptoms. "We try to help them to determine where that fear is coming from, what the basis for that fear is, in order to make sure that they are, No. 1, safe. And if it's a fear that is not currently present, then to teach them coping skills in order to help deal with the feelings." Degner testified that in cases of sexual abuse, it is concerning to have secrecy from a victim "[b]ecause there are oftentimes where there is threat or manipulation or coercion that a child is taught in order to avoid them disclosing information." According to Degner, the children have made progress and are working on coping techniques. The children's father has never participated in any therapeutic session with the children and has never contacted Degner to find out what coping skills his children are utilizing. (On cross-examination Degner acknowledged that she had never attempted to contact Bradley to engage him in therapy with these children.) When asked what the children need from a caregiver going forward in order to maintain the progress that they have achieved, Degner said the children "need somebody who's going to be stable in terms of being present, to provide a home that is safe, that -- they need to provide emotional support. They need to be able to kind of reinforce what [the children are] learning." The children also need emotional and physical safety.

Degner would discuss Bradley with the children "[i]f they initiate the conversation." When Bradley came up in sessions, Phoenix "[a]t times" seems fearful of him in that she has disclosed that he choked her and that there were disclosures of sexual abuse. Bradley II also appeared fearful of his father in that he made statements about physical abuse. Akira's "discussions are almost negligible in terms of her father."

Degner explained the general process that RSafe follows when the permanency objective is reunification but there has been an adjudication of sexual abuse. She said, "The process is that a child would undergo extensive therapy to ensure that they are able to understand how to protect themselves, what the privacy rules are, that they are not at fault, and that they know how to ask for help." "We would also expect that the parent . . . that the child is planning to reunify with also go through extensive individual therapy; that we would have access to collaboration with the

parent['s] . . . therapist; that the . . . parent would fully accept the abuse that they caused." When asked how a parent accepts responsibility, Degner responded, "Generally, they do that in therapy with their therapist as well as with the child where they would develop an apology, either a letter, statement verbally, and when appropriate -- when deemed appropriate by all therapists, that would be presented to the child." And "[e]ssentially, the [child's and the parent's] stories would have to match. So the parent . . . would be expected to not minimize the abuse that happened." Additionally, the parent would have to be legally "cleared" to make sure that reunification is safe, and "the victim would have to be willing." When asked if she had provided therapy to a client who was reunified with their perpetrator, Degner responded, "Yes"; "I think twice." Degner said that reunification is not a short process, and the average time frame is "[g]enerally, about a year, year and a half." Degner acknowledged that she did not know whether or not these children could be successfully reunified through therapy with their father.

The State also called the children's current foster mother to testify. The children had been in her care since October 2017. The foster mother stated that Phoenix was "very concerned" she was going to get "whooped" whenever she was in trouble. Phoenix also has a lot of sexualized behaviors (when playing with Barbies, "she's having Barbies have sex or they're talking about sex," "at one point she had the dad doll kiss the daughter doll and she was like, 'No. That is not how you kiss me. That's how you kiss mommies, not daughters'"). Phoenix has also "tried to insert things into her vagina a couple of times." Bradley II "was very aggressive, hitting other children," would lie, and "[h]e also has some sexualized behaviors that's apparent when they're playing." "When they're playing, he would also have dolls have sex and talk about sex and he . . . was very touchy-feely with . . . my private areas and his sisters' and pretty much any female in the family that he was around." He is also concerned about being "whooped" when he is in trouble. Akira also had sexualized behaviors; she runs around the house naked. "She would hit me or her sister or brother, lots of scratching, lots of aggression." The foster mother would let Degner know of any concerns.

Bradley called Dr. Kirk A.B. Newring, a licensed psychologist who specialized in forensic psychology, as a witness. Dr. Newring testified that he was contacted to conduct a sexual violence risk assessment for Bradley. Bradley initially contacted Dr. Newring's office in approximately August 2017, but an assessment was not completed at that time because Dr. Newring had not received the referral from NFC and without that referral Bradley could not afford to pay for the assessment himself. (Bell testified that she sent a referral in October after Bradley was released from incarceration, and then sent a second referral after being informed that no one contacted Bradley.) The assessment was ultimately completed in January 2018.

Dr. Newring diagnosed Bradley with (1) adjustment disorder with anxiety and depression, (2) cannabis use disorder, and (3) nicotine-use disorder. Dr. Newring did not diagnose Bradley with any "paraphilic disorders," which are "durable, inappropriate, harmful sexual interest[s]" because Bradley did not meet the diagnostic criteria. Dr. Newring determined that Bradley's "risk of sex offense would be the same for every male in the community"; Bradley is not at an elevated risk.

On cross-examination, Dr. Newring stated that a single act of touching would not necessarily constitute sexual deviance. "More than one act over a period of 6 months or more for a sexual -- or period -- motivation would be required." The State also asked Dr. Newring what

Bradley would have had to present with in order to qualify as an elevated risk for sexual misbehavior. Dr. Newring responded:

> Showing more indications of elevated risk and the risk factors there, the "chronicity" speaks to sexual behavior occurring over a period of time. "Diversity" is doing a bunch of different kinds of sexual behaviors." "Escalation" is going from a nonconfrontational to a more overt physical.
>
> There's no indication there's a progression or a durable sexual interest in engaging in repeat acts of sexually harmful behavior. Those are the things that would show elevation of risk.

Exhibit 49, Dr. Newring's report on his evaluation of Bradley, also reflects the following. "Bradley . . . was so profoundly malodorous of cannabis and tobacco that the undersigned and those in the office had commented. The odor was detectable from outside the building." "Available records as well as Bradley's self-report indicate that while Bradley was the nominal parent of these children Betty W[.] did most of the raising of these kids." Betty was also Bradley's primary caretaker when he was growing up.

> Bradley appears to use marijuana, video games, music and rapping as coping skills. While these may be suitable coping skills, they may not be healthy coping skills given the obligation to care for his children. Bradley appears to be reliant upon others to assist in the raising of his children and as their support and availability is limited so is Bradley's ability to effectively parent. Bradley appears to be of sufficient motivation and capacity that he *could* be an effective parent. The undersigned did not find data to suggest that Bradley . . . poses a danger of sexual harm to the children in his care.

(Emphasis in original.)

Beyond testifying about his evaluation of Bradley, Dr. Newring was asked at the termination hearing about statements reportedly made by the children. When asked if, in his professional capacity, he had been called upon to evaluate statements that are made by children, Dr. Newring said, "Yes." And when asked if he was qualified to do that, Dr. Newring again said, "Yes." He had also been trained to recognize different biasing factors that might exist. During the evaluation, Bradley showed Dr. Newring a video of a girl stating that her "'privacy'" had been touched; it was Dr. Newring's understanding from Bradley that the girl in the video was Phoenix. There was another adult in the video and it appeared to Dr. Newring "that there was the adult figure pushing the child through a statement, coercing a statement, more extracting a statement from a child than would typically be seen in a nondirective or structured forensic interview to inquire as to a child about an event." Dr. Newring stated there were concerning elements in the clip that Bradley showed him. For example, he observed: "authority confirmation bias," which is when "the child says something to please an authority figure or under duress by an authority figure." Additionally, it did not appear that the child understood the nature and purpose of the questioning (e.g., that it is not make-believe and that it is for real). Furthermore, a child can presume that the adult understands what they are talking about even if the child and adult do not understand words to have the same meaning; "In other words, if a child says 'privacy,' and 'privacy' means anything between nipples and kneecaps, that might not be the same understanding as the adult understands

'privacy' to mean.'" "If we conclude that [the action is] sexually motivated and illegal from the get-go," there can be "confirmation bias" in evaluations, "that they find what they're looking for rather than find what happened." Dr. Newring testified that behaviors, including sexual behaviors, exhibited by a child are not necessarily diagnostic of abuse; transition or change can be stressful for a child and can also lead a child to have increased sexualized behaviors in that "a child is engaged in self-soothing touch and the genital region has a lot of nerve endings that feel nice when touched. So children can engage in mindless self-soothing by rubbing their vulva if they're a girl or penis if they're a boy."

Dr. Newring had reviewed exhibits 43, 44, and 45, the statements made by Phoenix, Bradley II, and Akira. He noted that "[w]hooping" is an example of a word that may have different meanings for a child and an adult. Additionally, "whooping" can have different meanings in different cultures; it could be describing an abusive event or an innocuous event. According to Dr. Newring, with African Americans, it is more common to have a distrust of police and CPS, so Dr. Newring would not be especially concerned if an African American child said they cannot tell their secrets; he would want to talk some more with the child about what was behind the statement. Finally, Dr. Newring found Phoenix's statement that "'Daddy touched my privates,'" concerning because it was so consistent and was not explained or given context. A repeat of a simple, concise statement over the course of several years, without context, would "raise a concern that the child learned what to say and that what the child learned to say might not reflect an event that occurred." And according to Dr. Newring, a child's statement that daddy put a remote in her vagina would raise red flags if the statement did not come until after the child had had no contact with that parent for multiple years, and the child had been in multiple placements.

On cross-examination, Dr. Newring acknowledged that he had never met with the children or spoken with their therapist. It was concerning to Dr. Newring that Bradley had completed a chemical dependency evaluation that made no recommendations for treatment but yet Bradley came to Dr. Newring's office smelling of marijuana. "[H]e consumed marijuana coming in for a psych eval, and there's concerns about his parenting. Put all of that together, I would expect some -- or could anticipate a benefit of demonstrating sobriety during the evaluation, even though he acknowledged he's got marijuana as a coping skill."

Bell testified that she did not find the psychosexual evaluation to be valid, although she acknowledged that she did not have any training in assessing forensic psychosexual evaluations. She said that the information provided in the psychosexual evaluation was that Bradley was "intoxicated, if you will." And Bell did not feel like the psychosexual evaluation portrayed what was being reported to her. Bell stated she had received ongoing reports of disclosures by the children of sexual and physical abuse. Since January 8, 2018 (the date of the evaluation), "there's been a lot of information . . . that I think would have been helpful in a psychosexual evaluation." When asked what efforts she made to refer or relay any of that information to Dr. Newring, Bell stated, "Well, he already completed the assessment." And she did not request an updated assessment.

Bradley called three witnesses from Educare (the school director, a school social worker, and an associate teacher) to testify. Educare is an early Head Start facility that Phoenix, Bradley II, and Akira attended from 2014 to April or May 2016. None of the three employees had concerns or suspected abuse or neglect prior to the children's removal from their home. The social worker

from the school had done in-home visits "maybe, about four times within two years" and did not notice anything concerning; the in-home visits occurred in Betty's home. However, the associate teacher saw a change in Phoenix's behavior after she was removed from Betty's home; Phoenix became more reserved and would rock back and forth.

Bradley also testified at the hearing. He acknowledged he had been court ordered not to have visits with his children since January 5, 2016. Since then he had not been in contact with his children directly or indirectly. While the case was pending, he made efforts to comply with the requests of NFC. He completed a 12-week parenting program which was not court ordered, but "was something that I decided to do myself" and "anything that would be requested of me later just to knock it out of the park." He completed a chemical dependency evaluation, but no treatment was recommended. And notwithstanding the appeal of the adjudication, he communicated with his caseworker about getting a psychosexual evaluation. Bradley contacted Dr. Newring's office to set one up "after a long, long wait of waiting on them." Bradley was never asked by either Kwiatkowski or Bell to complete a budget. As far as he knows, he has completed all of the requirements to be reunited with his children. And he wants to be reunified with his children.

On cross-examination Bradley acknowledged that people told him the steps he needed to take in order to get visits; Kwiatkowski "laid out a few steps I could take in order to do that, and she was supposed to assist me with that." When asked, "So you have been made aware of the steps you could take to get visits reinstated since the case started?" Bradley responded, "I've been aware of people that were supposed to help me get it done." "[T]his whole thing came out of left field. You know what I mean? Being totally ignorant to how all of this goes, I would definitely -- I would have liked some guidance. Guidance that was not there."

JUVENILE COURT'S DECISION

In an order filed on June 22, 2018, the juvenile court terminated Bradley's parental rights to Phoenix, Bradley II, and Akira after finding that statutory grounds for termination existed pursuant to § 43-292(2) and (7), and that termination of parental rights was in the children's best interests. The court found that statutory grounds pursuant to § 43-292(1) and (9) were not proven by sufficient evidence.

Bradley appeals the juvenile court's order.

ASSIGNMENTS OF ERROR

Bradley assigns that the juvenile court erred in (1) admitting out-of-court statements from the children, (2) finding sufficient evidence to terminate his parental rights under § 43-292(2), and (3) finding termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

CHILDREN'S OUT-OF-COURT STATEMENTS

Bradley claims that the juvenile court erred in admitting out-of-court statements from the children over his hearsay and foundation objections. Specifically, he challenges the statements made by the children found in exhibits 43 to 45, and set forth in detail previously in this opinion. The exhibits generally included statements by the children that "daddy touched my privates," they were "choked" by Bradley, and they were "whooped" by Bradley or "Nana"; the foster mother also reported to Degner that Phoenix had put objects in her vagina and said that her father did that to her with a remote.

The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *In re Interest of Destiny A. et al., supra.*

Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), provides an exception to the hearsay rule, regardless of the availability of the declarant, for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). See, also, *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

Where an individual is alleged to be the victim of sexual assault, statements reasonably pertinent to medical diagnosis and treatment of both physical and psychological trauma are admissible under rule 803(3). *State v. Vigil, supra.* The Nebraska Supreme Court has said:

[I]n addition to statements made to physicians, we have held that a child's statements to a therapist describing sexual abuse were admissible under rule 803(3). We have also held that statements by a child's foster mother to a therapist, reporting unusual sexual behavior by a child and her suspicions of sexual abuse, were admissible under rule 803(3).

*State v. Vigil*, 283 Neb. at 136, 810 N.W.2d at 695 (citing to *In re Interest of B.R. et al., supra*).

*In re Interest of B.R. et al.* was an adjudication case wherein the rules of evidence applied. In that case, three children were alleged to be within the meaning of § 43-247(3), in part, due to the fault or habits of Billy, who was the stepfather of B.R. and the natural father of the two other children; Billy was alleged to have subjected B.R. to inappropriate sexual contact, placing the children at risk of harm. B.R.'s therapist testified regarding conduct that had been relayed to her by the children's foster mother. Specifically, the therapist testified the foster mother reported that either B.R. or E.B. had put her mouth on the other's genital area when the children were not dressed

- 12 -

and that the girls had been kissing each other with their tongues. Billy's counsel twice objected to the testimony of the therapist regarding observations relayed to her by the foster mother as hearsay. The court overruled Billy's objections under the medical diagnosis exception to hearsay. On appeal, Billy claimed that this testimony did not fall within the § 27-803(3) exception because the exception applies only to statements made by a declarant patient, not to statements made by a third party. The Nebraska Supreme Court disagreed. The court stated:

> Although the heart of this exception lies in statements made by a patient to a treating physician, the exception casts its net wider than the patient-physician relationship. Under the federal and Nebraska rules of evidence, statements admissible under the medical diagnosis and treatment exception are not restricted to statements made by the patient and the statements need not be made to a physician. . . . As a general rule, the exception applies to persons seeking medical assistance from persons who are expected to provide some form of health care. . . . Thus, "[t]he declarant need not be the patient--need not be the person who is experiencing the symptoms to be diagnosed or treated. In other words, the statement need not refer to the declarant's own symptoms."

> We conclude that the statements made by B.R.'s foster mother were admissible under § 27-803(3). B.R.'s foster mother observed first hand the conduct she subsequently described to [the therapist]. The fact that the statements in question came from the patient's foster mother, not the patient herself, does not preclude their admissibility under § 27-803(3), as long as the evidence satisfactorily demonstrates that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment, that the declarant's statements were reasonably pertinent to such diagnosis or treatment, and further, that a doctor would reasonably rely on such statements. . . .

> The record reflects that B.R. began seeing [the therapist] in May 2004 for foster care adjustment purposes. Based on B.R.'s behavior in her foster home, concerns arose that B.R. had been sexually abused. Clearly, evidence that B.R. had been sexually abused was important to her medical diagnosis and psychological treatment, and therefore, information relating to that possibility was properly admitted under § 27-803(3). Hence, we conclude that [the therapist's] testimony was admissible under § 27-803(3).

*In re Interest of B.R. et al.*, 270 Neb. at 691, 708 N.W.2d at 591 (citations omitted).

According to Degner's testimony, any interactions she had with the children was as their therapist. And any statements the children (or the foster mother) made to Degner were made through the therapeutic process. When asked if she reasonably and regularly relied upon statements such as these in a therapeutic process to provide accurate therapy to her clients, Degner responded, "Yes." Based on our de novo review of the record and using the Nebraska Evidence Rules as a guidepost, we find that the admission of the statements in exhibits 43 to 45 did not violate Bradley's fundamental due process. The statements are admissible under rule 803(3). And we find that proper foundation was laid for such statements.

Bradley argues that at "the outset of the case, therapy was engaged at the direction of law enforcement for the specific purpose of eliciting disclosures from the children. . . . According to police reports, it was specifically recommended that Phoenix 'receive one month of therapy to see

if she will make a full disclosure.'" Brief for appellant at 33 (quoting from exhibit 49, Dr. Newring's report). Bradley suggests that the statements made by the children were not made in contemplation of medical diagnosis or treatment. However, Degner's testimony as to the medical diagnosis and treatment provides otherwise. Additionally, as to the claim that therapy was engaged at the direction of law enforcement for the specific purpose of eliciting disclosures from the children, we note that Degner was not the children's initial therapist. Degner did not begin treating the children until March 2017 (more than a year after their initial removal) and the statements in exhibits 43 to 45 were made from April 2017 to March 2018. There is no indication that Degner was working under the direction of law enforcement.

Furthermore, even if the children's statements had been gathered, in part, for investigatory purposes, that fact does not necessarily preclude the admissibility of the statements. A statement is generally considered admissible under the medical purpose hearsay exception if gathered for dual medical and investigatory purposes. *State v. Vigil, supra*. The predominant purpose of the statement is not the real question in determining admissibility. *Id*. The fundamental inquiry is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment. *Id*. And Degner's testimony was that any statements the children made to her were made through the therapeutic process, and that she reasonably and regularly relied upon statements such as these in a therapeutic process to provide accurate therapy to her clients.

In summary, we find that the statements in exhibits 43 to 45 were admissible. The juvenile court did not err in admitting the statements.

STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Bradley's parental rights to the children, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect) and § 43-292(7) (children out-of-home for 15 or more months of most recent 22 months).

Bradley does not assign error to the juvenile court's finding that statutory grounds for termination existed pursuant to § 43-292(7), and the record reflects that termination on such grounds was proper. The children had been in an out-of-home placement continuously since December 2015. At the time the motion for termination of parental rights was filed in August 2017, the children had been in an out-of-home placement for 20 months. At the time the termination hearing commenced in March 2018, the children had been in an out-of-home placement for 27 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Bradley's parental rights under § 43-292(7) were proven by sufficient evidence. We therefore need not consider Bradley's argument with respect to the propriety of the termination of his parental rights pursuant to § 43-292(2), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*. Thus,

- 14 -

the next inquiry is whether termination of Bradley's parental rights is in the children's best interests.

BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

In this case, the children were removed from Bradley's custody in December 2015 based on allegations of sexual abuse, leaving the children with an inappropriate caregiver, and failing to provide proper parental care and supervision. The children have been consistent in their disclosures that they had been "whooped" and "choked" by Bradley, and as to Phoenix, that Bradley had touched her "privates." The disclosures were still coming out in 2017 and 2018, after the children were adjudicated.

Beyond the nature of the disclosures, there are concerns about Bradley's lack of engagement with his children and with the caseworkers. Pursuant to an order in January 2016, Bradley was ordered not to have visitation with the children until further order of the court. Following the children's removal and the order prohibiting visitation, Bradley did little over the next year and a half to put himself in a position to have visitation with his children, let alone to be reunified with them. From February to June 2016, Bradley either met with Kwiatkowski and refused services, or refused to meet with her. It was not until the end of June, after the adjudication hearing, but before the juvenile court's order of adjudication, that Bradley asked what he needed to do to get his children back. Kwiatkowski suggested that he participate in a psychosexual evaluation and informed Bradley that she could do a referral (in which case NFC would have helped with the cost) if he could not afford the evaluation on his own. Although Bradley's counsel makes an issue of whether or not Bradley's completion of a budget was a prerequisite for the referral (Kwiatkowski said it was, but Bell was able to refer without a completed budget), the fact remains that Kwiatkowski told Bradley that a budget needed to be completed, but Bradley would not meet with her. According to Kwiatkowski, Bradley stated, "'If there was nothing more to talk about, he would -- in-person, as his case was on appeal, then he would just prefer that we did not

- 15 -

meet.'" Kwiatkowski stated they did not progress any further. From September 2016 to May 2017, Bradley either refused to meet with Kwiatkowski or to engage with her, or her attempts to contact him were unsuccessful. It was not until July 2017 (after the adjudication was affirmed on appeal), that Bradley's lawyer emailed Kwiatkowski asking that a psychosexual evaluation be set up for Bradley. Kwiatkowski forwarded the email to Bell, who had taken over as FPS. Bradley called Bell in July stating that he wanted to start visits with his children and wanted to know what he needed to do to accomplish that; Bell suggested a family team meeting to go over next steps. Bell testified that their first team meeting was in October because Bradley had been incarcerated since the end of July (the incarceration was related to a domestic incident Bradley had with the mother of another one of his children not at issue in the present case, but the charges against him were apparently dropped and he was released in October). Bell did meet with Bradley while he was incarcerated. In August they discussed services that Bradley could participate in, namely a chemical dependency evaluation and a psychosexual evaluation. Bell's attempts to meet with Bradley in November and December were unsuccessful; in January 2018 Bradley told Bell that he did not want to meet with her and that she needed to contact his lawyer with concerns or questions.

During Kwiatkowski's time on the case, Bradley expressed desire to parent his children, but he had not demonstrated any behaviors to support that expressed desire. Bell testified that Bradley had not provided any monetary support, clothing, cards, or letters to his children.

Bradley did complete a parenting course in what appears to be February 2018 (the certificate stated the course was held November 2017 through February 2018, but then states that the certificate was presented in February 2017; clearly there is a clerical error somewhere in the dates). Bradley also apparently completed a chemical dependency evaluation (per his testimony and Dr. Newring's report), but Bell did not receive a copy of the chemical dependency evaluation (the agency did not pay for the evaluation, so Bradley had to sign a release). The chemical dependency evaluation does not appear in our record. The evaluation apparently did not recommend any treatment, which is curious (even to Dr. Newring) given that Bradley showed up to his psychosexual evaluation "malodorous" of cannabis and per Dr. Newring, Bradley uses marijuana as a coping mechanism. As noted, Bradley eventually completed the psychosexual evaluation in January 2018 and Dr. Newring did not find Bradley to be at an elevated risk for sex offenses. However, Dr. Newring spent a good portion of his report and testimony questioning the credibility of the children's reported allegations. This is despite the fact that Dr. Newring neither met the children nor talked with their therapist.

Regardless of Dr. Newring's findings, the fact of the matter is that Bradley did not complete the psychosexual evaluation until 2 years after the children's removal. And while Bradley places blame on the State for the delay, Kwiatkowski's testimony makes it clear that it was Bradley who did not want to take the necessary steps to complete the evaluation, particularly once the adjudication was on appeal. Bradley's willingness to delay the evaluation is particularly troubling since he was specifically told the evaluation was a necessary step in order to get visitation with his children.

Degner said the children "need somebody who's going to be stable in terms of being present, to provide a home that is safe, that -- they need to provide emotional support." It was Bell's opinion that Bradley "cannot provide safety and well-being for the children and also attend to their emotional well-being." Bradley "has not shown any efforts to ask about the kids' emotional

well-being, and he's had no contact with them since -- for two years." When asked if Bradley had taken independent steps to alleviate the concerns that brought the case into care, Bell responded, "No." The fact that it took over a year for the psychosexual evaluation to be completed had an impact on Bell's opinion, as did the fact that he did not complete any services until "just a few months ago." Bell testified that it was in the children's best interests to terminate Bradley's parental rights. She testified the children deserve permanency. And Degner testified that while it is possible for reunification to occur when there has been an adjudication of sexual abuse, reunification is not a short process, and the average time frame is "[g]enerally, about a year, year and a half."

The children have been in an out-of-home placement since December 2015. As Bell testified, Bradley had done nothing "until just a few months" prior to the termination hearing in the spring of 2018. Although Bradley was court ordered to have no visitation with his children, he was not precluded from sending them letters or cards, yet he did not do so. According to his own testimony, he had not had contact with his children directly or indirectly. At the time of the termination hearing, the children had been in an out-of-home placement for 27 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We find that the State has rebutted the presumption of parental fitness as to Bradley. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Bradley's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Bradley's parental rights to Phoenix, Bradley II, and Akira.

AFFIRMED.